IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:13-cv-137-FDW
(3:07-cr-119-FDW-4)

| | | |
|---|---|---|
| ALFREDO HOMES SUSI, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside, or

Correct Sentence pursuant to 28 U.S.C. § 2255, (Doc. No. 1), and on the Government's

Response to Petitioner's Motion to Vacate, (Doc. No. 19). Petitioner is represented by Michael

David Gelety.

## I.   BACKGROUND

Petitioner Alfredo Homes Susi is serving a sentence of 124 months, after being convicted in

this Court of running a fraudulent sweepstakes scheme from Costa Rica. The Fourth Circuit

Court of Appeals described the scheme as follows:

> The scheme consisted of the following pattern: first, the "opener," an employee at
> the call center, would call and inform the victim that he had won second prize,
> usually several hundred thousand dollars, in a sweepstakes. The telemarketer
> would fraudulently represent himself as a federal agent of a non-existent "United
> States Sweepstakes Security Commission," or of the "United States Sweepstakes
> Security Bureau," or some similar moniker. The opener would then tell the victim
> that, in order to claim the prize, he must wire several thousand dollars via Western
> Union to "Lloyds of London of Costa Rica" as an insurance premium to insure
> delivery of the money. If the victim was successfully persuaded to send money, a
> co-conspirator known as a "loader" would call again and tell him that a mistake
> had been made and that the victim had actually won first prize, typically several
> million dollars. The loader would tell the victim that, because the prize was larger,

1

the insurance fees would also be higher. The co-conspirators would continue to call and "load" a victim for as long as the victim continued to wire money. The sweepstakes concept was a pure fraud and never existed so no prize money was ever paid to any of the victims of the scheme.

        The call center at issue in this case (hereinafter "the Kalchstein call center") was operated by Martin Kalchstein ("Kalchstein"), a former business associate of Susi's. Susi began working at the call center in Costa Rica during May 2005 but left during October 2005 and returned to the United States. Susi called victims, initially playing the part of an opener but eventually working as a loader. Kalchstein testified during trial that Susi earned between $50,000 and $60,000 in commissions during his time working at the call center and directly caused approximately $250,000 in losses to victims. Kalchstein also testified that the call center as a whole took in about $40,000 per week and approximately $2.5 to $3 million total during its total operating history.

United States v. Susi, 378 Fed. App'x 277, 280 (4th Cir. 2010).

On May 21, 2007, Petitioner was arrested in Miami, Florida, on the original sealed complaint filed in this Court. See (Criminal Case No. 1:07-mj-02679-TEB-1, Doc. Nos. 1; 2 (S.D. Fla.)). On May 25, 2007, a detention hearing was held in the Southern District of Florida before U.S. Magistrate Judge Stephen T. Brown. (Id., Doc. No. 3). Judge Brown granted Petitioner bond upon certain conditions. (Id., Doc. No. 5). On May 29, 2007, the Government filed in this Court a motion to revoke and stay the release order entered by the magistrate judge in the South District of Florida. See (Criminal Case No. 3:07-cr-119-FDW-DCK-4, Doc. No. 7 (W.D.N.C.)). This Court granted the motion to revoke and stay the same day, and Petitioner was subsequently removed from the Southern District of Florida and brought to this district. (Id., Doc. No. 8).

On June 4, 2007, Petitioner was charged in this Court with one count of conspiracy to defraud, under 18 U.S.C. § 371, and twenty-three substantive counts of wire fraud, under 18 U.S.C. § 1343, along with co-defendants Jaime Ligator, Sheldon Brenowitz, Allen Fialkoff, and Chad Schneider. (Id., Doc. No. 11: Indictment). The indictment also included a notice of

forfeiture under 18 U.S.C. § 982(a)(8).  Plea discussions started shortly after Petitioner's arrest.

On June 5, 2007, the first of two proffer interviews was conducted.  (Civil No. 3:13cv137: Doc.

No. 19-2 (W.D.N.C.)).  As a result of the interviews and subsequent investigation, the

Government learned that Petitioner had about $1 million held in an account with the Swiss bank

Maerki Baumann & Co. AG.  Petitioner had initially claimed that he had only a few hundred

thousand dollars in the account.  During a bond revocation hearing held in this Court on July 9,

2007, Petitioner admitted that he had almost $1 million in the Swiss bank account.  (Criminal

Case No. 3:07-cr-119-FDW-DCK-4, Entry Dated July 9, 2007).  At the conclusion of the

hearing, the Court affirmed the May 25, 2007, order of pretrial release and denied the

Government's motion for revocation of the order of release.  (Id.).  However, the Court added

that, as a condition of release, Petitioner was required to repatriate the monies held by him in his

offshore accounts and deposit those funds in a Department of Justice bank account.  (Id.).

Rather than repatriating the funds in the Swiss bank account, Petitioner filed, on August

29, 2007, a motion to amend the order of release to exclude the requirement that Petitioner

repatriate the monies so that he could keep his overseas monies.  (Id., Doc. No. 46).  The

Government opposed Petitioner's motion to keep his overseas monies, and, thereafter, filed two

separate motions relating to these assets: (1) a motion to repatriate the property subject to

criminal forfeiture, i.e., Petitioner's overseas assets, and (2) a motion seeking to compel

Petitioner to disclose the nature and location of property subject to criminal forfeiture.  (Id., Doc.

No. 49; Doc. No. 50).

On September 20, 2007, the Court granted the first of the Government's motions and

issued an order compelling Petitioner to disclose the nature and location of the property subject

to criminal forfeiture (the "Disclosure Order").  The Disclosure Order stated, inter alia:

> [Petitioner] . . . shall itemize, in the form of an affidavit submitted to the court no later than 5:00 p.m., Monday, October 1, 2007, all property held by [him] or on [his] behalf that is described in the indictment as being subject to forfeiture, whether such property is located in the United States or elsewhere, and shall disclose the location of such property . . .

(Id., Doc. No. 51).  On September 21, 2007, the Court denied Petitioner's motion to amend the conditions of his pretrial release, granted the Government's motion, and ordered that Petitioner repatriate certain foreign assets (the "Repatriation Order").  (Id., Doc. No. 52: Order Denying Motion to Amend Conditions of Pretrial Release).  The Repatriation Order stated, inter alia:

> The Defendant ALFREDO SUSI is HEREBY ORDERED to take all steps necessary to repatriate the funds and property held by Maerki Baumann & Co. AG and Belize Bank Ltd. to the jurisdiction of the court and to forthwith surrender the funds and property to the United States Marshals Service pending further order of this Court.

(Id., Doc. No. 53).

Petitioner moved for and received an extension of time until October 31, 2007, to file his asset affidavit.  (Id., Doc. Nos. 57; 59).  However, Petitioner did not file the required affidavit by October 31, 2007.  On November 6, 2007, the Government filed a motion for Petitioner to show cause why Petitioner should not be held in civil contempt.  (Id., Doc. No. 58).  In this motion, the Government represented, inter alia, that Petitioner's counsel had informed the United States that Petitioner refused to fill out the affidavit, and further reported that Petitioner stated, "I've been screwed before and I do not want to be screwed again."  (Id. at 3).

The show cause hearing was held on December 12, 2007.  See (Id., Doc. No. 108). During the hearing, Petitioner's counsel explained that, rather than complying with the Court's order to repatriate all of the money, Petitioner was willing to bring back only an amount of money equal to the amount of the loss he believed was attributable to him.  (Id. at 7-8).  After some discussion during the hearing related to the logistics of repatriating the money, the Court

4

gave Petitioner until December 31, 2007, to repatriate the money. (Id. at 18). The Court advised Petitioner that if he did not repatriate the money he would be held in civil contempt beginning January 1, 2008. (Id.). The Court also advised Petitioner that he would not receive any credit for the time spent in jail until he complied with the Court's order to repatriate the funds. (Id. at 19).

Petitioner did not repatriate the money by December 31, 2007. Petitioner's trial began on March 31, 2008. The defense presented no evidence at trial, and on April 2, 2009, the jury returned a verdict convicting Petitioner of Counts 1, 4, 5, 6, 7, and 11-24.[1] (Criminal Case No. 3:07-cr-119-FDW-DCK-4, Doc. No. 99: Jury Verdict). The jury returned a special verdict form, finding that Petitioner had derived $1,850,000 in proceeds from the conspiracy and that he had derived $35,359 as a result of the wire fraud. (Id., Doc. No. 100: Special Verdict Form).

On September 3, 2008, the probation office filed a final presentence report ("PSR"), which calculated an advisory guideline sentencing range of 168-210 months in prison based on a total offense level of 35 and a criminal history category of I. (Id., Doc. No. 128 at 17: PSR). The PSR began with a base offense level of 7 and added the following points under the sentencing guidelines: 14 points under U.S.S.G. § 2B.1.1(b)(1)(H) based on a loss amount of more than $400,000 but less than $1 million, with an exact amount of $760,000; 6 points under U.S.S.G. § 2B1.1(b)(2)(C) based on a finding that the offense involved more than 250 victims; 2 points under U.S.S.G. § 2B1.1(b)(8)(A) based on a finding that the offense involved a misrepresentation that the defendant and others were acting on behalf of a government agency; 2 points under U.S.S.G. § 2B1.1(b)(9)(B) based on a finding that a substantial part of the sweepstakes scheme was committed from outside the United States; 2 points under U.S.S.G. §

---

[1] The Government dismissed the other Counts at the beginning of the trial. (Id., Entry Dated Mar. 31, 2008).

3A1.1(b)(1) based on a finding that the victims were vulnerable due to age, physical, or mental condition; and 2 points under U.S.S.G. § 3C1.1 based on a finding that Petitioner failed to comply with an order to repatriate property issued pursuant to 21 U.S.C. § 853(p). (Id. at 12). Petitioner filed objections to the PSR. (Id., Doc. No. 123: Objections).

On November 19, 2008, Petitioner repatriated approximately $1,105,000 from his Swiss bank account. On November 24, 2008, the Court held Petitioner's sentencing hearing. See (Id., Doc. No. 171: Sentencing Hr'g Tr.). At sentencing, Petitioner withdrew his objections, and the Court thereafter adopted the calculations of the advisory guidelines as found in the PSR. (Id. at 165). The Court sentenced Petitioner to 60 months of imprisonment on Count One and to 180 months of imprisonment on each of Counts 4 to 7 and 11 to 24, with all sentences to run concurrently. (Id. at 174). The Court further ordered Petitioner to pay restitution of $4.2 million, and the Court also entered a separate forfeiture order for $1,885,359. (Id. at 175; 177; Doc. No. 153: Final Forfeiture Order).

During the sentencing hearing and after discussions with counsel related to their efforts to repatriate the money, the Court ultimately decided to give Petitioner credit nunc pro tunc for part of the time he served under the contempt order. (Id., Doc. No. 171 at 163-64). Rather than denying any credit for time served from January 1, 2008, through November 19, 2008, the Court decided that, based on the defense attorneys' efforts, beginning on May 1, 2008, in getting Petitioner to repatriate the money, Petitioner was in compliance as of that date. (Id.). Petitioner was, therefore, given credit for time served from May 1, 2008, through November 19, 2008.

Petitioner appealed. On May 14, 2010, in an unpublished opinion, the Fourth Circuit affirmed Petitioner's convictions, but vacated and remanded for re-sentencing. United States v. Susi, 378 Fed. App'x 277 (4th Cir. 2010) (unpublished) (hereinafter "Susi I"). The Fourth

Circuit found that this Court erred by considering the total restitution of all 16 call centers operating in Costa Rica instead of just the "Kalchstein call center" where Susi worked. Id. at 287. In preparation for the second sentencing hearing, Petitioner filed his Objections to the new PSR on October 1, 2010, and he filed a Motion for Downward Departure/Downward Variance on December 3, 2010.[2] (Criminal Case No. 3:07-cr-119-FDW-DCK-4, Doc. No. 224: Objections; Doc. No. 228: Motion for Downward Departure/Downward Variance).

On December 7, 2010, this Court held Petitioner's re-sentencing hearing. At re-sentencing, the Court applied the calculations and guideline range as stated in the original PSR. See (Id., Doc. No. 238 at 5: Re-sentencing Hr'g Tr.). The Court granted a "modest variance" for "extraordinary restitution" and "cooperation" and reduced Petitioner's sentence to a total of 160 months, with a reduced restitution amount of $1,105,000. (Id. at 58; 100; 102; 103; 104; Doc. No. 231: Amended Judgment). Petitioner appealed, and on March 21, 2012, the Fourth Circuit affirmed in a published opinion. United States v. Susi, 674 F.3d 278 (4th Cir. 2012) (hereinafter "Susi II").

Petitioner filed the pending motion to vacate in this Court through counsel on March 2, 2013. In his 93-page motion to vacate, Petitioner brings numerous claims of ineffective assistance of counsel against his trial attorneys George Young, Ricardo Hermida, and Randolph Lee. On May 22, 2014, the Government filed under seal a Rule 35 motion to reduce Petitioner's sentence. (Criminal Case No. 3:07-cr-119-FDW-DCK-4, Doc. No. 263: Sealed Motion). On June 23, 2014, the Court granted the Rule 35 motion and reduced Petitioner's sentence from 160 to 124 months of imprisonment. (Id., Doc. No. 267).

---

[2] On December 6, 2010, Petitioner filed a package of information and documents under seal related to his co-operation with D.E.A. agents in Miami. See (Id., Doc. No. 230).

## II.    STANDARD OF REVIEW

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein.  After examining the record in this matter and the Government's Response, the Court finds that the argument presented by the Petitioner can be resolved without an evidentiary hearing based on the record and governing case law.  See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III.    DISCUSSION

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense.  See U.S. CONST. amend. VI.  To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010).  Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'"  Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)).  Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice."  Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008).  If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance

prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

## A. Ground One—Petitioner's Claims of Ineffective Assistance of Counsel During Plea Negotiations and Before Trial

Petitioner first asserts that his attorneys were ineffective because they did not properly advise him to plead guilty by either accepting the Government's plea offers or by pleading to the indictment without a plea agreement. Petitioner's claim is without merit. First, although plea discussions commenced shortly after Petitioner's arrest, with the plea discussions focusing on various sentencing enhancements, the Government never made a formal plea offer. It is well settled that "there is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial." Weatherford v. Bursey, 429 U.S. 545, 561 (1977). Here, after realizing that Petitioner was not going to cooperate with repatriating the funds he was holding in the Swiss bank account, the Government refused to enter into a plea agreement and instead chose to go to trial.

Moreover, the record makes clear that it was Petitioner, not defense attorneys, who caused the cessation of the plea negotiations. Petitioner's brother Sam Susi testified at Petitioner's sentencing hearing to the fact that Petitioner was not willing to plead because of the issues involving the $1 million in the Swiss bank account:

> My brother was arrested I believe in the end of May -- I'm not sure of the exact days -- or the middle of May of 2001. I believe that's correct. Within a couple of weeks before my knowledge he had hired Mr. Hermida. Okay. Mr. Hermida immediately recommended that my brother plead his case out. He proffered twice within a couple of weeks after being arrested. He admitted his involvement. So there's nobody here saying that my brother didn't commit fraud and that he didn't do something illegal. Okay. The problem has always been, Judge, the money. Let's be real about this.

(Criminal Case No. 3:07-cr-119-FDW-DCK-4, Doc. No. 171 at 83-84: Sent. Tr.). As to Petitioner's contention that his three attorneys never discussed with him the possibility of pleading to the indictment without a plea agreement, even assuming Petitioner's contention is true, he cannot show prejudice under Strickland. This is because if Petitioner had pled guilty without a plea agreement he would have been in exactly the same position he was in after being convicted by a jury—that is, he would have faced the same sentencing issues.

Petitioner contends, however, that if he had pled guilty without a plea agreement he would have received a reduction in his sentencing guidelines calculations for acceptance of responsibility under U.S.S.G. § 3E1.1, which provides for a two-point reduction for acceptance of responsibility. This claim is without merit. A sentence reduction for acceptance of responsibility is discretionary, and a defendant who enters a guilty plea is not entitled to a sentence reduction as a matter of right based on acceptance of responsibility. See Application Note 3 to U.S.S.G. § 3E1.1. Furthermore, Petitioner's own misconduct in refusing to comply with the Court's order to repatriate the money in his overseas bank accounts resulted in his being held in civil contempt. The civil contempt resulted in Petitioner receiving a two-point enhancement for obstructing or impeding the administration of justice under U.S.S.G. § 3C1.1. Under the sentencing guidelines, conduct resulting in an enhancement under U.S.S.G. § 3C1.1 "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." Application Note 4 to U.S.S.G. § 3E1.1. Petitioner has simply failed to show that he would have received a reduction in his sentencing guidelines calculations for acceptance of responsibility if he had pled guilty without a plea agreement. Petitioner similarly asserts that his attorneys were ineffective by allowing him to go to trial, causing him to forfeit "any chance" of getting a sentence reduction based on substantial assistance under U.S.S.G. § 5K1.1. Again, Petitioner has

simply not shown ineffective assistance under <u>Strickland</u>.

Petitioner also assumes that if he had pled guilty he would have been granted a reduction under U.S.S.G. § 3B1.2 for having a minimal or minor role in the offense.  This contention is also without merit.  The issue of having a minimal or minor role was raised during the sentencing hearing and ultimately decided against Petitioner, with this Court stating:

> Now, I understand that you were working at one call center and you were directly responsible for a small portion of that.
> We can argue its 200,000, 300,000, 400,000, up to 750,000, but what you particularly touched shows not that you were a minor participant in this case, rather it shows that you were fully aware of what was going on.

(Criminal Case No. 3:07-cr-119-FDW-DCK-4, Doc. No. 171 at 167).  Since Petitioner has lost on this issue, he cannot now claim he would have had a different result if he had pled guilty.

Petitioner next claims that his attorneys were deficient for not advising him of the impact of certain evidence presented by the Government.  Specifically, Petitioner complains that he was not informed about the impact of the introduction of his own statements, such as "the best f--g closer in this room . . . I'm too talented to deal with those sh--t leads that you buy . . . I'm the best, I'm the most talented loader in the room."  (Doc. No. 1 at 35).  Petitioner also complains that he was not told that several of his co-conspirators would testify against him and explain, in detail, how the scam worked.  He further complains that his lawyers never told him that the jury would see his elderly victims and hear the about the true impact of his crimes.  Here, Petitioner is essentially implying that if he had only known how strong the Government's evidence was going to be he would have changed his mind and pled guilty.  As the Court had already discussed, however, Petitioner had no option to plead guilty because, when the Government realized that he was not going to repatriate the money, the Government refused to offer Petitioner a plea.

Petitioner also claims that his attorneys somehow rendered ineffective assistance of

counsel by allowing him to provide a proffer interview as part of attorneys' efforts to obtain a plea agreement. Specifically, Petitioner asserts in his Section 2255 petition that he "was not told and did not understand he . . . would be unable to claim ignorance or even minor participation in the conspiracy" following the proffer, in which Petitioner made a full confession. (Doc. No. 1 at 34). To this extent, Petitioner claims that he was not told that, because of the proffer, he was then unable to testify at trial. In this contention, Petitioner is essentially asserting that his attorneys were deficient in that he was not told and did not understand that by providing a proffer he was not going to be able to lie during trial. This contention is wholly without merit, as counsel does not render deficient performance by requiring that his client be truthful. Petitioner also claims that he was unaware that, by providing a proffer, his attorneys' cross-examination of the Government's witnesses would be restricted. The proffer agreement, of course, places no such restriction on the defense. Again, the Government is only allowed to introduce the statements made during the proffer if the questions asked during the cross-examination of Government witnesses seek to illicit answers that are different from what Petitioner told the Government during the proffer.

Finally, in support of Ground One, Petitioner makes numerous, unsupported assertions concerning his retained attorneys, but none of these unsupported assertions are related to any specific allegations of ineffective assistance of counsel. For instance, Petitioner complains about his relationship with Ricardo Hermida, the number of face-to-face meetings they had, and the fact that Mr. Hermida did not like to fly to Charlotte. Petitioner also complains that George Young and Mr. Hermida did not get along personally. Petitioner claims that Mr. Young had a substance abuse problem during the trial, but Petitioner does not explain how he knows about this issue, nor does he point to any specific actions or inactions related to the alleged substance

abuse. Petitioner also complains about Mr. Young's prior issues with the Texas State Bar. Here, Petitioner's vague and conclusory allegations regarding various alleged conduct by defense counsel fail to show ineffective assistance of counsel under <u>Strickland</u>.

In sum, for the reasons stated herein, Petitioner's Ground One is without merit.

**B. Ground Two—Petitioner's Claims Regarding Ineffective Assistance of Counsel during the Sentencing Hearing**

In Ground Two, Petitioner alleges various claims of ineffective assistance of counsel at sentencing, in which his primary contention is that the Court misapplied the sentencing guidelines. For the following reasons, this claim is without merit. First, and most importantly, it is well settled that a collateral attack on a final judgment in a criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice. Misapplication of the sentencing guidelines typically does not constitute a miscarriage of justice. <u>United States v. Mikalajunas</u>, 186 F.3d 490, 495-96 (4th Cir. 1999); <u>United States v. Pregent</u>, 190 F.3d 279, 283-84 (4th Cir. 1999). Thus, Ground Two fails for this reason alone. In any event, for the following reasons, Petitioner has simply not shown that he received ineffective assistance of counsel at sentencing.

Petitioner first asserts that his attorneys were deficient because they withdrew his objections to the PSR report and that they did not advise him in advance of the waiver. The record flatly contradicts Petitioner's contention that attorneys did not advise him in advance of the waiver. Indeed, attorneys went out of their way to confer with him during the sentencing hearing on this very issue and to explain what they were doing to the Court. Just before the lunch break, Petitioner's counsel addressed the Court as follows:

MR. LEE: I have conferred with two of the finest legal minds I have been privileged to know, Mr. Hermida and Mr. Sam Susi, and I won't attest to my judge of character, but we have reached an agreement, the three of us as attorneys and members of the defense case, to make a proposal to Freddie Susi, which we think will short-circuit the hearing considerably by hours, but more importantly will inure to his long-term benefit. And if the Court would be so kind -- I know it's been a strange week with the jury trial and things -- but I would ask the Court's gracious indulgence to give the three of us as attorneys a chance to run to the Marshal's Office here in the back here and talk to Freddie and tell him what we recommend. At that point we may have to build a record.

             ….

THE COURT: All right. The defendant is back in the courtroom. If he needs a moment to the talk to counsel, I'll allow him to do that.

MR. LEE: Your Honor, for the record, both Mr. Hermida and I spoke at length with Mr. Freddie Susi at lunch through the kind offices of the U.S. Marshal Service here. After talking to Freddie Susi, I would tender to the Court several things. One, we will not be presenting evidence at this time today on the objections we made to the PSR. I don't feel I need to belabor the reasons for that. I would suggest to the Court that under the standards of persuasion proof that the government has to support their requested enhancements in offense conduct that they certainly have presented enough evidence by which the Court could rule in their favor against us. With that said, we are not inviting the Court to take our nonproduction of evidence as an acquiescence and concurrence and acceptance that the PSR is correct, but we're not going to be presenting evidence.
I let the Court know I believe that's Freddie Susi's decision as well. We will proceed, with the Court's permission, at some point; proceed forthwith into a proposed sentence with variance arguments.

THE COURT: Right.

MR. LEE: I had filed PSR objections. I would submit those to the Court at the appropriate time for informational purposes, but not to argue or contest the objected matters.

(Criminal Case No. 3:07-cr-119-FDW-DCK-4, Doc. No. 171 at 21-25).

In order to make it clear on the record, the Court then asked the following

question of defense counsel:

THE COURT: All right. …. Is the core here then your argument for a variance, and, therefore, basically all your objections to the Presentence Report for purpose of the advisory Guidelines are either effectively withdrawn, or -- or are you going to still argue some of those? Because I have to have closure on that issue. I can't

get to 3553(a) without first completing the advisory Guideline analysis. The <u>Booker</u> decision makes that abundantly clear.

(<u>Id.</u> at 30-31).  The Court took a short recess, and then proceeded as follows:

> THE COURT:  All right. We're now – we've ended our recess.  The defendant has met with his counsel. The defendant has just been brought back into the courtroom, so I believe we're ready to proceed.

> MR. LEE:  We are, Your Honor. And I will inform the Court that we will now formally withdraw our objections to the Presentence Report. We will not contest the enhancements. I would like my objections to be considered, though, in the way of a narrative proffer for an appropriate sentence, and I can argue that later.

> THE COURT:  All right.

> MR. LEE:  I'm just trying to avoid putting up a lot of evidence and witnesses. We all can agree to what the core facts are. It's what you draw from it. At least I hope that's the case.

> THE COURT:  So the specific objections that affect the Sentencing Guideline calculation, the loss amount, the obstruction enhancement, the request for an acceptance of responsibility reduction, the request for a mitigating role reduction, all of those specifically are hereby withdrawn. Is that correct?

> MR. LEE:  It is correct, Your Honor. We will -- we have things that we presented under the rubric of an objection, but we'd present those rather in the form of a variance. I don't know if the old civil practice is -- but, you know, you used to make those general demur type of things.

> THE COURT:  I haven't heard that word in a long time.

> MR. LEE:  We're not adopting the pleadings, but we're not going to contest that, however.

> THE COURT:  All right. Thank you.

> MR. LOEWENBERG: Your Honor, I would ask Mr. Lee -- the question I have for him -- for the Court is: Are we going to revisit these same arguments under 3553? Because the loss is not a 3553 factor.

> THE COURT:  Well, the scope of the criminal conduct, the seriousness of the offense, I think it can be considered there.

> MR. LEE:  And what we're doing, Your Honor, just a signal to the Court, we

understand the significance of the jury's verdict, you know, general and special, on both the crimes and the forfeiture. We are going to put up evidence to show Mr. Susi's direct involvement with the loss. With that said and done, that again supports more the argument of how little involved he was in this conspiracy. And that kind of goes into the issue, again, of how big or narrow the scope of the conspiracy was. We aren't arguing those for objection factors, but I'll argue this for 3553(a) factors and for the purposes of sentencing and all those other things.

THE COURT: All right. Thank you.

(Id. at 32-34).

Here, defense counsel clearly made a tactical choice to withdraw what were undoubtedly losing PSR objections and, instead, present them as a basis for a variance. Rather than being ineffective assistance of counsel, this was, in fact, a shrewd tactical move because it allowed the defense to go first, while putting the Government, which had an overwhelmingly strong case, in the position of having to defend the enhancements without being able to put on its entire case. Under the guise of requesting a variance, the defense was allowed to present evidence on each and every sentencing enhancement. This allowed the defense to focus the Court on the grounds for a variance rather than on the Government's evidence of each enhancement. In sum, Petitioner has simply not shown ineffective assistance under Strickland.

Petitioner also complains that his attorneys were ineffective for not obtaining the proffer of co-defendant Jaime Ligator because it would supposedly have contradicted the time period that Petitioner's former business associate Martin Kalchstein gave to the jury – i.e., that Petitioner worked in the Kalchstein call center from May through September 2005. Petitioner's contention is wholly without merit. First, Petitioner fails to disclose to the Court that, at the time of Petitioner's trial and sentencing, co-defendant Jaime Ligator was a fugitive in Costa Rica fighting extradition. Ligator was not extradited back to this country until 2009 and did not have his initial appearance until August 30, 2009. Second, in Ligator's affidavit, attached to the

Section 2255 petition, Ligator states that Petitioner began working in the call center in May and that in mid-September Petitioner said he had quit the call center. See (Doc. No. 3 at 3: Decl. of Ligator). Thus, a proffer from Ligator would have only corroborated Kalchstein's trial testimony. Attorneys' failure to provide evidence to corroborate Kalchstein's testimony on this issue was not ineffective assistance of counsel.

In sum, for the reasons stated herein, Petitioner's Ground Two is without merit.

## C. Ground Three--Petitioner's Claim that He Received Ineffective Assistance of Counsel Based on Attorneys' Failure to Properly Advise Petitioner Regarding the $1 Million in Petitioner's Swiss Bank Account

Petitioner next asserts that he received ineffective assistance of counsel because defense counsel failed to properly and accurately advise Petitioner regarding the $1 million in Petitioner's Swiss bank account. This contention is without merit. First, Petitioner does not allege that he would have repatriated the money "but for" the advice of his counsel. In fact, Petitioner does not even deny that counsel advised him to repatriate the money. Petitioner appears to be claiming that counsel somehow should have done more to overcome Petitioner's own refusal to repatriate the money. This contention is baseless. The record shows that it was Petitioner, and Petitioner alone, who was consistently and persistently unwilling to give up the money in his overseas accounts. As the Court has already discussed, when completing his financial disclosure forms for his first bond hearing, Petitioner chose not to disclose that he had $1 million in a Swiss bank account. It was not until around eleven days later when he was specifically asked about the Swiss bank account during his first proffer that Petitioner finally disclosed that he had money in a Swiss bank account. Even then, Petitioner falsely claimed that he had only a few hundred thousand dollars in the account rather than admitting that he had $1

million.  Even after it was revealed that he had $1 million in the Swiss bank account during his second bond hearing on July 9, 2007, Petitioner still tried to keep the money out of the Court's control.  Instead of complying with the Court's order to repatriate the funds held in the Swiss bank account, Petitioner filed, on August 29, 2007, a motion to amend the order of release to exclude the requirement that Petitioner repatriate the monies held in certain offshore accounts so that he could keep his overseas monies.  The Government eventually filed a motion for a show cause hearing, which was held on December 12, 2007.  Defense counsel explained during the show cause hearing that, despite a court order to do so, Petitioner had not repatriated the entire $1 million because he was only willing to bring back the amount of loss attributed to him, "which would be from 75 to 120, in that range."  See (Criminal Case No. 3:07-cr-119-FDW-DCK-4, Doc. No. 108 at 7-8).  Defense counsel also told the Court in the hearing that "[w]hat we want to do is bring back the money on Mr. Susi's terms."  (Id. at 8) (emphasis added).

Defense counsel's statements make clear that it was Petitioner who was unwilling to fully comply with the Court's orders.  Clearly, Petitioner disagreed with the Court's order to repatriate the monies and at some point he had decided that he was simply not going to comply.  At the show cause hearing, the Court gave Petitioner until December 31, 2007, to repatriate the money, with the warning that he would be held in civil contempt if he did not comply.  The Court further warned Petitioner that beginning January 1, 2008, he would not receive any credit for the time spent in jail until he did comply with the Court's order to repatriate the funds.  Petitioner did not repatriate the money by December 31, 2007, and he was placed in civil contempt on January 1, 2008.  Petitioner ultimately did not repatriate the funds until November 19, 2008—just days before his sentencing hearing—although this Court gave him time-served credit from May 1, 2008, due to his attorneys' efforts.  At the sentencing hearing, Petitioner's brother, Sam Susi (an

18

attorney) tried to explain to the Court why Petitioner had not repatriated the money earlier:

THE WITNESS:  … The problem has always been, Judge, the money. Let's be real about this.

THE COURT:  Well, I think that was evident to the Court during the bond hearing a year ago.

THE WITNESS:  Now, if I can explain why.

THE COURT:  But I don't think they want you to explain why.

MR. HERMIDA:  No, Your Honor. I want him to explain why. But I want to make clear about what we're talking about; what monies we're talking about.  It's not necessarily the money in Switzerland. I think the biggest difference that the defense had with the government was as to the amount of loss attributed to Mr. Susi and the fact, as Your Honor correctly pointed out earlier today, we couldn't get over the conspiracy amount versus the actual amount. And we were always here, but we didn't have to be there, I guess is what I'm trying to say. But I didn't want to interrupt, but I wanted to clarify.

THE WITNESS:  So the difficulty from my brother's perspective, because I had these conversations with him, was how can they -- how can they -- how -- "I caused 50,000, 100,000, whatever number you want to use in loss here. I will give them twice that much. I will give them three times that much. Why do they want to take every penny that I have that was not directed from this?" They know it wasn't. They know that nobody else is giving.

….

THE WITNESS: I'm a lawyer, you know, as many of us in this room are. We understand conspiracy. We understand the fact that you're responsible for things that occurred even after. I will tell that even as a lawyer, it took me a long time to get my hands around the concept of withdrawal because it's just difficult to understand that legal distinction. But as a lawyer, after reading the cases - reading it, I understand. How difficult is it for somebody who is not a lawyer, who is involved in a fraud, who commits -- who causes people to lose money, who now is faced with the option of "I now volunteer that I'm guilty. I've given up any ability to defend myself, even if I thought I could. I volunteered I'm guilty to the government. And now they want to take everything that I have." So that in the context -- and these are not assets that he earned as a result of this particular fraud. So at the end of the day that's the difficulty. Him crossing that line from one place to the other. And that's resulting in what I perceive, both as a lawyer and as a layperson, as a huge disparity between similarly situated people. He will get more time -- and while I agree that 5K1s are important and the purpose of getting people to cooperate to break up these things are important. That wasn't the issue in my brother's case. He admitted his participation. So then the issue became now proffered, we're going to take you down the road unless you give us all these assets. And I tried to get him to give them the assets, as

Mr. Hermida.  He just was unable to do so.

(Id., Doc. No. 171 at 84-87).  This testimony makes clear that both the defense attorney and Petitioner's brother Sam Susi were trying to get Petitioner to surrender the assets, but that it was Petitioner himself who chose not to give up the money.  Here, Petitioner has simply not shown that he received ineffective assistance of counsel under Strickland.

In sum, for the reasons stated herein, Petitioner's Ground Three is without merit.

**D. Ground Four—Petitioner's Claim that He Received Ineffective Assistance of Counsel Based on Counsel's Failure to Preserve Challenges to Instances of Prosecutorial Misconduct**

Petitioner next asserts that his defense attorneys were deficient because they failed to preserve instances of prosecutorial misconduct.  Specifically, Petitioner claims that the Government committed prosecutorial misconduct by using inflammatory terms describing the crime, and commenting on the nature of Petitioner's actions.  Petitioner specifically complains about the use of "thief," a "faceless coward," a "greedy and merciless man," a "devious con artist," and a "morally bankrupt telemarketer" perpetrating an "outrageous, greedy horrific" crime on hundreds . . . thousands of victims."  Petitioner also complains about the Government's presentation of evidence concerning the age and vulnerability of the victims.  Finally, Petitioner additionally complains that the prosecutors appealed to the emotions of the jurors and made a so-called "Golden Rule" argument.

Petitioner is barred from bringing these ineffective assistance of counsel claims in his Section 2255 petition because he is attempting to raise the same issues that this Court and the Fourth Circuit Court of Appeals have already decided against him.  It is well settled that a defendant cannot "circumvent a proper ruling . . . on direct appeal by re-raising the same

challenge in a § 2255 motion." <u>United States v. Linder</u>, 552 F.3d 391, 396 (4th Cir. 2009);

<u>Boeckenhaupt v. United States</u>, 537 F.2d 1182, 1183 (4th Cir. 1976) (holding that a criminal

defendant cannot "recast, under the guise of collateral attack, questions fully considered [on

direct appeal]").  Here, in the first appeal, Petitioner asserted that throughout the trial the

prosecutor engaged in a pattern of prejudicial misconduct, the cumulative effect of which denied

Petitioner's right to a fair trial.  Petitioner specifically objected to comments made by the

prosecutors to the effect that the crime was particularly heinous and that Petitioner was of bad

character.  The Fourth Circuit denied all of Petitioner's arguments regarding prosecutorial

misconduct, stating, "There is also no evidence that the prosecutor's statements that, for

example, the crime was 'horrific,' or that Susi was a 'greedy, merciless man,' crossed the line of

vigorous advocacy." <u>Susi</u>, 378 Fed. App'x at 283.  The Fourth Circuit further specifically found

that Petitioner's "argument that the prosecutor improperly commented on the victims' age or

vulnerability is without merit." <u>Id.</u>  Finally, as to Petitioner's contentions regarding the Golden

Rule, the Fourth Circuit also rejected this argument, stating that "[t]he prosecutor did not

improperly appeal to the jurors' sympathy, nor did he ask the jury to make a decision as if they

were in the victims' position." <u>Id.</u>  In sum, the issues Petitioner raises here regarding alleged

prosecutorial misconduct were fully decided on direct appeal and are, therefore, now barred from

being raised in this Section 2255 petition.

 As part of his fourth claim, Petitioner makes additional, conclusory allegations about

other alleged improper conduct by the Government.  For instance, Petitioner asserts that the

Government made faces and gestures "during Susi's cross-examination." <u>See</u> (Doc. No. 1 at 81).

To the extent that Petitioner means the gestures occurred while Petitioner himself was on the

stand at trial, this allegation is entirely baseless, given that Petitioner did not even testify at trial.

Petitioner also asserts that the Government used "false or questionable" testimony of Martin Kalchstein, the operator of the call center where Petitioner worked. (<u>Id.</u> at 79-80). Petitioner appears to be trying to infer that the Government knowingly used perjured testimony by Kalchstein. This contention is also baseless. Specifically, Petitioner implies that Kalchstein testified in a separate trial against Michael Mangarella, another participant in the sweepstakes scheme, to a loss amount for his call center that was substantially less than the amount he testified to Petitioner's trial. <u>See</u> (<u>Id.</u>). Petitioner then suggests that, since the two amounts are inconsistent, Kalchstein's testimony in Petitioner's trial must have been false. <u>See</u> (<u>Id.</u>).

Petitioner's contention fails. Here, Kalchstein testified in Petitioner's trial <u>well before</u> he testified in the Mangarella trial. That is, Petitioner's trial began on March 31, 2008, and concluded on April 2, 2008. Mangarella's trial did not begin until September 15, 2008, and it concluded on September 18, 2008. <u>See</u> (Criminal Case No. 3:06-cr-151-FDW-DCK-3, Entry Dated Sept. 16, 2008). The Government certainly would not be expected to foresee at Petitioner's trial in March 2008 that Kalchstein would give an inconsistent statement five months later in a different trial. Moreover, as the Government notes, the inconsistency in Kalchstein's testimony was known by the defense at the time of Petitioner's sentencing. Kalchstein's testimony at the Mangarella trial had been transcribed by the time of Petitioner's sentencing hearing. In fact, the transcript of Kalchstein testimony in the Mangarella trial was admitted as a defense exhibit during Petitioner's sentencing hearing. Moreover, Sam Susi (Petitioner's brother) testified at length about the conflict in Kalchstein's testimony in an effort to reduce the loss amount in the PSR. (Criminal Case No. 3:07-cr-119-FDW-DCK-4, Doc. No. 171 at 102-117). In addition, both defense counsel and the Government argued the issue at length. (<u>Id.</u> at 102-118). Ultimately, the Court decided that the disparity between Kalchstein's testimonies in

the two trials made no difference, pointing out that the defense and Government were only $100,000 apart in their loss calculations—$300,000 versus $400,000. (Id. at 118). In sum, Petitioner has simply failed to show any wrongdoing or malfeasance at trial or sentencing based on the fact that Kalchstein made inconsistent statements regarding the loss amount.[3]

In sum, for the reasons stated herein, Petitioner's Ground Four is without merit.

**E. Ground Five—Petitioner's Contention that He Received Ineffective Assistance of Counsel because Defense Counsel Failed to Move to Recuse the Trial Judge**

Petitioner next contends that his defense attorneys were deficient because they did not move to recuse the undersigned based on the undersigned's (1) knowledge obtained from handling other sweepstakes fraud cases, and (2) forming an opinion about Petitioner based on the evidence presented. A judge's rulings and expressions of opinion generally fail to justify recusal. The Supreme Court has explained:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved. . . . Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

Liteky v. United States, 510 U.S. 540, 555 (1994) (citation omitted) (where the defendant moved to disqualify the judge on the ground that, during an earlier criminal trial, the judge displayed "impatience, disregard for the defense and animosity" toward the defendant). See also United

---

[3] Moreover, as the Government notes in its Response, even accepting Petitioner's contention that the loss amount attributable to Petitioner was lower than that found by the Court, the difference in the loss amount does not affect the points assessed against Petitioner under the guidelines. See (Doc. No. 19 at 15-16).

States v. Grinnell Corp., 384 U.S. 563, 583 (1966) (stating that "[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source . . . other than what the judge learned from his participation in the case"); see also Belue v. Leventhal, 640 F.3d 567, 572 (4th Cir. 2011) (stating that, in order to disqualify a judge, the "bias or prejudice must, as a general matter, stem from a source outside the judicial proceeding at hand").  Moreover, ordinarily, a judge's comments at sentencing expressing outrage at the defendant's conduct or at the defendant himself, and/or an urge to see the defendant severely punished, are not grounds for disqualification.  See, e.g., United States v. Cronin, 429 Fed. App'x 241, 243 (4th Cir. 2011) (unpublished) (no due process violation based on bias where at sentencing the judge described the defendant in unflattering terms, including calling him a "sociopath" and a "monster").  Here, since neither the undersigned's experience handling other sweepstakes fraud cases nor the undersigned's opinions about Petitioner would have formed any basis for a recusal motion, Petitioner's defense attorneys cannot have been ineffective for failing to make a frivolous motion.

Finally, Petitioner also makes an unsupported allegation in the Section 2255 petition concerning the decorum expected in the courtroom but fails to connect it specifically to anything in the trial.  See United States v. Dyess, 370 F.3d 354, 359-60 (4th Cir. 2013) (stating that "vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court").

In sum, for the reasons stated herein, Petitioner's Ground Five is without merit.

## IV.     CONCLUSION

For the reasons stated herein, the Court will dismiss the § 2255 petition.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's § 2255 motion to vacate, (Doc. No. 1), is **DENIED** and **DISMISSED**.

2. Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, this Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); <u>Miller–El v. Cockrell</u>, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong).

Signed: April 9, 2015

Frank D. Whitney
Chief United States District Judge